UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY DURLEY,

                    Plaintiff,

        v.                                    Case No. 20-cv-1890-pp

BRIAN TAPLIN,
and KYLE DEMERS,

                    Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 58) AND DISMISSING CASE

        Plaintiff Timothy Durley, who is confined at Waupun Correctional Institution and is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against a nurse and a correctional officer at Waupun. The defendants have moved for summary judgment. Dkt. No. 58. The plaintiff opposes the motion. Dkt. No. 90. The court finds that the defendants are entitled to judgment as a matter of law, grants the defendants' motion and dismisses the case.

## I.    Facts

### A.    Procedural Background

        The plaintiff filed his complaint on December 21, 2020, alleging that after officers sprayed a nearby incarcerated person with chemical agents, the defendants had ignored his request for nebulizer treatment. Dkt. No. 12 at 1 (citing Dkt. Nos. 1, 7). The court allowed the plaintiff to proceed on Eighth

Amendment claims against prison officials Brian Tupin, Timothy Kutea and Kyle Ditmers. Id. at 7–8.

The Wisconsin Department of Justice accepted service on behalf of defendants Tupin (whose correct name is Brian Taplin) and Ditmers (whose correct name is Kyle Demers) but could not identify a prison official by the name of Timothy Kutea. Dkt. No. 13. On April 19, 2021, after Taplin and Demers responded to the complaint, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 16. The court also ordered that by July 2, 2021, the plaintiff must identify the proper name of the third defendant. Id. at ¶1. The court advised the plaintiff that if he did not identify the third defendant by the July 2, 2021 deadline, "the court may dismiss [the third defendant] from this case." Id. The plaintiff did not identify Kutea by the July 2, 2021 deadline, or request additional time to do so. On July 13, 2021, the court dismissed Kutea from the lawsuit. Dkt. No. 17.

Between August and October 2021, the plaintiff filed numerous motions—asking the court to compel discovery, asking it to impose sanctions against the defendants and seeking other relief. Dkt. Nos. 18, 19, 27, 29, 32, 35, 36, 37. On October 18, 2021, the court stayed the deadlines for the parties to complete discovery and file dispositive motions and scheduled a telephone status conference to address the plaintiff's motions. Dkt. No. 42. The court conducted that conference on November 3, 2021, explained the discovery process to the plaintiff and addressed his concerns about viewing certain

department policies. Dkt. No. 49. The court denied the plaintiff's pending motions and extended the deadlines for the parties to complete discovery and file dispositive motions. Id.

Later, the court again extended the deadline for the parties to file dispositive motions, dkt. no. 52, and the defendants filed their motion for summary judgment on January 27, 2022, prior to the extended deadline, dkt. no. 58. Three times, the plaintiff asked the court for an order allowing him to use his release account to pay for photocopies, dkt. nos. 72, 76, 82, and to grant him an extension of time to respond to the defendants' motion, dkt. nos. 74, 78, 80. The court denied the plaintiff's motions to use his release account to pay his litigation costs but granted him an extension of time to respond to the defendants' motion. Dkt. No. 86. On May 25, 2022, the plaintiff filed his response to the motion and his supporting materials. Dkt. No. 87–92. The defendants' motion is fully briefed.

B.    Factual Background

The plaintiff responded to the defendants' proposed findings of fact, dkt. no. 91, and filed his own proposed findings of fact in support of his opposition to the defendants' motion, dkt. no. 92. In both documents, the plaintiff disagrees with many of the defendants' proposed findings of fact, but in support of those factual disagreements he often cites only to his own (unsupported) proposed factual findings. Neither the plaintiff's disputes with the defendants' proposed facts nor his own proposed facts are evidence. Throughout his response materials, the plaintiff also cites his "exhausted

3

remedies," as well as interrogatories or admissions he sent to or received from one or both defendants. But the plaintiff did not include in his response materials any documents related to an institutional complaint filed at Waupun. Nor did he include the interrogatories or admissions he sent to, or received from, either defendant. Because none of those documents is in the record, the court cannot confirm their contents.

Because the plaintiff failed to produce the documents he cites in support of his proposed facts, there is no evidence in the record supporting the plaintiff's proposed facts. The court will not consider the plaintiff's factual disputes or proposed facts that he has not supported with *evidence* in the record. See Federal Rule of Civil Procedure 56(c)(1) and Civil Local Rules 56(b)(1)(C), (b)(2)(B) (E.D.Wis.). The court will deem admitted the defendants' properly supported facts because the plaintiff did not contest them with evidence. See Civil L.R. 56(b)(4); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission.").

1.    *The Defendants*

Defendant Demers is a correctional sergeant at Waupun and has been since February 17, 2019. Dkt. No. 60 at ¶2. Demers avers that he is not a medical professional and does not have authority over Waupun medical staff or their decisions related to medical treatment of persons incarcerated there. Dkt. No. 61 at ¶13. Demers cannot refuse an incarcerated person his medication without a reason. Id. If there is a security risk associated with providing

4

medical care to an incarcerated person, Demers consults and collaborates with medical staff in the Health Services Unit. Id. at ¶14. Demers avers that if medical staff determine that an incarcerated person does not demonstrate a medical necessity for treatment, security and health staff may collaboratively decide not to provide requested treatment. Id.

Defendant Taplin is a registered nurse and has worked as a Nurse Clinician 2 at Waupun since February 19, 2018. Id. at ¶3. Taplin avers that, as a nurse clinician, he provides nursing care to incarcerated persons at Waupun under the supervision of the Nursing Supervisor (who is not a defendant). Dkt. No. 62 at ¶4. He is responsible for assessing and treating patients, assisting physicians in providing medical services, managing medications and providing emergency care. Id.

2. *The Plaintiff*

The plaintiff is incarcerated at Waupun and was during the events described in the complaint. Dkt. No. 60 at ¶1. He was housed in the Restricted Housing Unit ("RHU") at Waupun during those events. Id. at ¶7. It is undisputed that the plaintiff has asthma. Dkt. No. 87-1 at 9 (Plaintiff's Exhibit 1000-05, Nutrition Note listing "historical" asthma). On August 8, 2020, the plaintiff received a nebulizer treatment in an exam room in the Health Services Unit. Id.

On August 11, 2020, however—about forty-five days before the incident described in the complaint—Captain Tritt (not a defendant) issued a memorandum to security staff at Waupun, relating to the plaintiff. Id. at 1

(Plaintiff's Exhibit 1000-01). The memo described several precautions and restrictions that staff must use when dealing with the plaintiff. A three-officer escort was required to remove the plaintiff from his cell, and the escort had to be approved by the supervisor of the restricted housing unit or shift supervisor (if the restricted housing unit supervisor was not available). Id. The plaintiff was to receive his meals, medication and supplies from the back of his cell. Id. He was to take his showers in his cell. Id. There was a specific restriction titled "Nebulizer treatment":

> A trap box will be utilized on the cell door and the hose and breathing tube will be run through the trap box with the nebulizer unit kept outside the cell. The Back of cell restriction will be followed to place the trap box on the cell door. A minimum of 2 security staff will be present.

Id. See also Dkt. No. 87-1 at 8, Plaintiff's Exhibit 1000-4 (Nursing Narrative Notes regarding the requirement that the plaintiff receive nebulizer treatments through the trap box).

### 3. *September 23, 2020 Incident*

On September 23, 2020, both defendants were working in the RHU. Dkt. No. 60 at ¶6. Demers was the assigned sergeant from 6:00 a.m. to 10:00 p.m., and Taplin worked from 1:30 p.m. to 9:30 p.m. Id. Demers was "involved in a suit up team and cell entry" involving a person housed in the same cell hall as the plaintiff. Id. at ¶8. Prison officials sprayed the other incarcerated person with Oleoresin Capsicum ("OC") spray, which is an incapacitating agent. Id. Demers avers that Waupun "is very well designed to accommodate the use of incapacitating agents targeted at one inmate with minimal secondary effects to

6

other inmates." Dkt. No. 61 at ¶7. He avers that when staff use OC spray, officials turn off the ventilation system to prevent the spray from contaminating adjacent cells. Id. According to Demers, the spray is a liquid and does not remain airborne, but prison officials still use the exhaust setting in the affected cell and range "to forcibly and effectively clear contaminated air from the cells." Id. at ¶8. Normal air circulation is resumed only after a supervising officer determines the air quality "has been restored." Id. at ¶9.

The plaintiff disputes Demers' description and asserts that when OC spray is used, it quickly spreads through the entire unit range. Dkt. No. 91 at ¶¶9–10. He says that "it takes officers awhile to restore the air quality and by the time that happens, inmates are already coughing." Id. at ¶11. In support of this assertion, the plaintiff cites proposed findings of fact from other cases. Id. at ¶¶9, 10.[1] Proposed findings of fact filed in other cases in other courts would not constitute evidence in this case, even if the plaintiff had provided them with his response materials—which he did not.[2]

---

[1] It is hard to read the plaintiff's writing, but one of the cases he cites appears to be Zebelere Garrison v. Captain J. Pope, No. 5:19-cv-291-TKW/MJF. Dkt. No. 91 at 2 ¶9. This is not a case from the Eastern District of Wisconsin—there are no judges in this district with the initials TKW or MJF. The second case he cites is Richardson v. Prisoners Transportation Services of America, which he indicates is a case from the Middle District of Pennsylvania. Dkt. No. 91 at 3, ¶10.

[2] The plaintiff also cites a declaration purportedly signed and submitted by Donald Alford-Lofton, the incarcerated person Waupun officials sprayed with OC spray on September 23, 2020. Dkt. No. 89 at 2–3. Previously the court struck this declaration because the plaintiff had forged Alford-Lofton's signature. Dkt. No. 100. The court ruled that it would not consider the forged declaration in ruling on the defendants' motion for summary judgment. Id. at

7

Demers avers that at the time, he did not know that the plaintiff was asthmatic, though he was aware the plaintiff previously had used a nebulizer. Dkt. No. 61 at ¶10. After the other person was sprayed, the plaintiff "yelled that he needed his nebulizer." Id. at ¶11. Demers says he could not "visibly tell" that the plaintiff was having any difficulty breathing. Id. at ¶16.

Taplin avers that he was not aware of the September 23, 2020 incident involving use of the OC spray. Dkt. No. 62 at ¶9. Security staff do not always tell Taplin when an incarcerated person is sprayed with OC spray unless they need him to assess that person. Id. After the incarcerated person was sprayed, security staff contacted the Health Services Unit to respond to the plaintiff's request for his nebulizer. Dkt. No. 60 at ¶15. At that time, Taplin was helping security staff place the sprayed person into a bed restraint. Id. Taplin avers that all he remembers is that he was in the cell next to the plaintiff's, "assisting with an inmate in bed restraint placement, when [the plaintiff] claimed that he needed his nebulizer treatment." Dkt. No. 62 at ¶10. He says the plaintiff "was screaming profanities and threatening physical harm to security staff." Id. at ¶11. Taplin avers that the plaintiff was kicking at his door, claiming he needed nebulizer treatment and that the plaintiff was yelling out of his cell for forty-five minutes without audibly wheezing or showing any signs of distress. Id. at ¶12. Taplin documented the same observations in a Nursing Narrative Note written on September 23, 2020. Dkt. No. 63-1 at 21. The note says that Taplin visually

3–4. Consistent with that order, the court will not consider or discuss pages 2 to 3 of Dkt. No. 89 in this decision.

assessed the plaintiff and noticed no signs or symptoms of shortness of breath or audible wheezing. Id.

Taplin avers that when he visually assessed the plaintiff September 23, 2020, the plaintiff "was not having an asthma attack." Dkt. No. 62 at ¶16. Taplin explains that he is not a respiratory therapist but that he has worked with asthmatic patients and is able to identify an asthma attack when it is occurring. Id. at ¶15. He says signs of an asthma attack include coughing, a wheezing or whistling when breathing, breathing problems (including shortness of breath, the person feeling like he is out of breath, gasping for air, having trouble exhaling or breathing more quickly than normal) and chest tightness. Id. at ¶17. Taplin avers that the plaintiff showed none of those signs when Taplin assessed him and did not allege that he was having an asthma attack. Id. at ¶18. Taplin further explains that "you can tell if a person is in distress by looking at them;" he says that there are "many nonverbal signs" of distress that "can be noted as part of a visual assessment," including labored breathing, profuse sweating and an inability to communicate verbally. Id. at ¶19. Taplin says that the plaintiff's ability to yell for over forty-five minutes showed Taplin that the plaintiff was not struggling to breathe. Id. at ¶20.

Captain Tritt (who is not a defendant) consulted with Taplin about whether it was medically necessary to enter the plaintiff's cell to give him nebulizer treatment, factoring in the security risk posed by the plaintiff's yelling and threats. Dkt. No. 60 at ¶26. Because the plaintiff was threatening staff, and because Taplin did not observe any sign that the plaintiff was in distress,

Taplin decided the plaintiff did not require nebulizer treatment at that point. Dkt. No. 62 at ¶22; Dkt. No. 63-1 at 21. Taplin avers he based this decision on his nursing judgment, which considered the plaintiff's access to alternative treatment like an Albuterol inhaler the plaintiff had in his cell. Dkt. No. 62 at ¶¶22–23. Taplin says the inhaler "is usually the first line of defense for shortness of breath." Id. at ¶23. If the inhaler is ineffective, then medical staff have the choice to use a nebulizer for treatment. Id. Staff may administer nebulizer treatment in an RHU exam room or at a holding cell. Id. at ¶24. Taplin indicates that "[a] nebulizer treatment is not the first thing we do;" during the forty-five minutes the plaintiff was yelling and threatening staff he did not give Taplin any indication that the inhaler was not effective. Id.

Taplin also notes the plaintiff recently had assaulted staff and refused to return a nebulizer after treatment, so RHU staff had to be very cautious in providing him nebulizer treatments; when needed, staff brought the nebulizer machine and an extension cord to the cell door, put a "trap box" on the cell door and fed the mouthpiece of the nebulizer through the door for the plaintiff to use. Id. at ¶25. Security staff watched him during the treatment, and Taplin avers that each step of this process "present[ed] a greater risk to the safety of everyone involved when a patient [was] screaming and kicking the cell door and threatening staff." Id. Based on his professional judgment and expertise, visual assessment of the plaintiff and the security concerns surrounding the plaintiff's behavior, Taplin "stand[s] by" his decision not to provide the plaintiff nebulizer treatment on September 23, 2020. Id. at ¶28.

Taplin relayed his message that the plaintiff did not require nebulizer treatment to Demers, to tell the plaintiff. Dkt. No. 60 at ¶31. Demers informed the plaintiff that he would not receive nebulizer treatment because of his threats to harm staff throughout the day and because of Taplin's assessment that nebulizer treatment was not medically necessary. Id. at ¶32. Demers avers that he had no say in whether the plaintiff received nebulizer treatment on September 23, 2020 (and thus did not refuse to give the plaintiff the nebulizer treatment on that date); that decision was up to medical staff in the Health Services Unit, including Taplin. Dkt. No. 61 at ¶¶15, 23. He says he would never refuse medical treatment to an incarcerated person in distress or having difficulty breathing because of threats the person is making and that he wouldn't instruct any staff under his supervision to do so; medical treatment decisions "must come from the Health Service staff." Id. at ¶22.

### 3. *Events After September 23, 2020*

On September 24, 2020, the plaintiff received a conduct report for his threats to staff the previous day. Dkt. No. 60 at ¶33; Dkt. No. 63-2. The plaintiff accepted "an uncontested major disposition," which the defendants explain means that he admitted he was making threats. Id.

After September 23, 2020, the next entry Taplin could find in the plaintiff's medical chart relating to a nebulizer was on November 18, 2020. Dkt. No. 60 at ¶35; Dkt. No. 63-1 at 19–20. The plaintiff's progress notes show that a registered nurse performing medication pass heard the plaintiff yelling that he needed nebulizer treatment. Dkt. No. 63-1 at 20. The plaintiff was "yelling at

[the nurse] in complete sentences." Id. The nurse told the plaintiff that his nebulizer treatment had been discontinued, at which point the plaintiff "[y]elled back at [her] in complete sentences." Id. The plaintiff yelled, "They can't do that" and "they will not give me my nebulizer" to other incarcerated persons on the unit. Id. The nurse told the plaintiff that, based on "the way he [wa]s yelling and speaking," he was "not in respiratory distress." Id. She told the plaintiff that if he was short of breath or in distress, "[they would] see him." Id. She reminded the plaintiff that he had the Albuterol inhaler if he needed it, and that if that didn't work "[they could] do a nebulizer by protocol." Id. When the nurse asked if he was okay, the plaintiff "[n]odded" and stated that he was "ok." Id. Neither defendant was involved with this incident.

### 4. *The Plaintiff's Declaration*

The plaintiff asserts that Demers and Taplin knew he had a back-of-cell restriction "and how nebulizer have to be on trap box;" he asserts that both were aware that he had asthma. Dkt. No. 88 at ¶¶8–9. He asserts that Demers has seen him use the nebulizer before. Id. at ¶10. He asserts that he pushed his emergency button in his cell "to have them inform the nurse who at that time was Taplin [that the plaintiff] need[ed his] nebulizer." Id. at ¶7. The plaintiff disputes Taplin's statement that he was not aware of the OC spray incident on September 23, 2020, dkt. no. 91 at ¶13, but in support of this dispute, he cites the declaration the court previously struck and "plaintiff interrogatories," which he did not provide the court.

The plaintiff disputes that he was not in distress "when [he] was allegedly using profanities and threats." Dkt. No. 91 at ¶16. The plaintiff says that he has received nebulizer treatment in the past when he was threatening staff or using profanities. Id. at ¶13; Dkt. No. 87-1 at 2. The plaintiff filed declarations from two other incarcerated person who said the same thing. Dkt. No. 89 at 1, 4. Anthony Keepers avers that he has been incarcerated at Waupun since 2014 and has spent much of his time in the RHU. Id. at 1. He says that he received "several conduct reports for threatening to harm staff." Id. Yet after each incident, he "still was able to receive medication at the door from staff four times a day." Id. Dexter Ewing avers that he was incarcerated at Waupun in March 2016 in the RHU. Id. at 4. He says a range officer was "taken a long time giving [him his] meds," so Ewing threatened him to "hurrie up before [he would] dash [the officer] with some piss." Id. He says the officer gave him his medication despite the threat. Id.

The plaintiff asserts that Taplin never stopped at his cell on September 23, 2020. Dkt. No. 88 at ¶14. (Taplin does not say he stopped at the plaintiff's cell; he avers only that he "visually assessed" the plaintiff. Dkt. No. 62 at ¶¶13, 16, 18.) The plaintiff also says Demers stopped at his door only to tell him he would not receive nebulizer treatment. Dkt. No. 88 at ¶15. The plaintiff insists that "due to [him] not getting [his] nebulizer [he] had a [*sic*] asthma attack by falling out." Id. at ¶16. In support of that assertion, he cites his own proposed findings of fact, which in turn cite "Plaintiff exhausted remedies." Id. (citing Dkt. No. 92 at ¶18). The court does not know what the plaintiff means by his

"exhausted remedies;" the plaintiff's response materials do not include copies of any institutional complaints he may have filed or rulings he may have received on those complaints. The plaintiff also asserts he told Taplin his Albuterol inhaler was not working, but he cites only his own proposed facts (which are not evidence) in support of that assertion. Id. at ¶18 (citing Dkt. No. 91 at ¶28).

## II.    Discussion

### A.    Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.     Eighth Amendment Standard

The court analyzes a plaintiff's claim that prison staff were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel-and-unusual-punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)). "A medical condition is deemed to be serious if it may be 'life threatening or pose[s] a risk of needless pain or lingering disability if not treated at once.'" Karraker v. Peters, 65 F.3d 170 at *3 (7th Cir. 1995) (citing Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991)). On the other hand, "it is clear that the Supreme Court contemplated that medical conditions far less critical than 'life-threatening' would be encompassed" by the term "serious medical need." Gutierrez v. Peters, 111 F.3d 1364, 1370 (7th Cir. 1997). Factors to consider in determining whether a plaintiff's medical need is sufficiently serious is whether his condition has been diagnosed by a physician as needing treatment, id. at 1373 (citing Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H. 1977); whether failure to treat the

condition could result in further serious injury or unnecessary and wanton infliction of pain, id. (quoting McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992); and whether the condition significantly affects the plaintiff's daily activities, id. (quoting McGuckin, 974 F.2d at 1059–60).

To satisfy the subjective component, the plaintiff must demonstrate that the defendants had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendants' "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

In the context a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

16

"A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

C.    Analysis

1.    *Factual Disputes*

To support his factual disputes with the defendants' version of events, the plaintiff mostly cites either his own, unsupported proposed findings of fact or documents that are not in the record (such as his "exhaustion of remedies" or "Plaintiff's interrogatories"). The only *evidence* the plaintiff has submitted are his verified complaint (dkt. no. 7), his declaration in opposition to summary judgment (dkt. no. 88), the declarations of two other incarcerated persons (dkt. no. 89 at 1, 4) and the exhibits he filed (dkt. no. 87-1).

When considering a motion for summary judgment, the court "draw[s] all reasonable factual inferences in the light most favorable to . . . the party that did not move for summary judgment." Watters v. Homeowners' Ass'n at Preserve at Bridgewater, No. 19-3499, 2022 WL 4128529, at *1 (7th Cir. Sept. 12, 2022) (citation omitted). Viewed in that light, the evidence shows that prior to the incident on September 23, 2020, the plaintiff and other incarcerated persons had received medication despite making threats to prison staff. Dkt. Nos. 89-1 at 1 (Anthony Keepers declaration); 89-1 at 4 (Dexter Ewing

declaration); 88 at 2, ¶12 (plaintiff's declaration). The evidence shows that on September 23, 2020, another incarcerated person was sprayed with OC spray by prison officials; that person was in the cell across from the plaintiff. Dkt. No. 7 at 3 (plaintiff's verified complaint);[3] Dkt. No. 61 at ¶6 (Demers declaration). The evidence shows that Waupun is designed to allow prison staff to vent the spray from the nearby cells to avoid contamination.[4] Dkt. No. 61 at ¶¶7-9 (Demers declaration).

After the other person was sprayed, the plaintiff yelled that he needed his nebulizer.[5] Dkt. No. 61 at ¶11 (Demers declaration). The plaintiff averred in his verified complaint that after the other person was sprayed, he informed Taplin and Demers that he "couldnt breath, & [was] weezing severely, that [he]

---

[3] The verified complaint "is the equivalent of an affidavit for purposes of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion.'" Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017) (quoting Ford v. Wilson, 90 F.3d 245, 246 (7th Cir. 1996)).

[4] In his unsworn opposition to the defendants' proposed findings of fact, the plaintiff disputes Demers' declaration about prison officials clearing an area of OC spray when it is used; he identified no evidence that supports that dispute and has cited proposed findings of fact filed in other cases in other courts. Dkt. No. 91 at ¶¶9-11. Even viewing the facts in the light most favorable to the plaintiff, the court must accept the defendants' version because it supported by a sworn declaration.

[5] In his unsworn response to the defendants' proposed findings of fact, the plaintiff argues that before he started yelling, he first pushed his emergency button to inform staff that he needed a nebulizer treatment. Dkt. No. 91 at ¶14. See also Dkt. No. 7 at 4, ¶5 (where the plaintiff avers that during the incident, he pushed his emergency button to tell staff in the bubble that he needed his nebulizer treatment, that he couldn't breathe and that another person had been sprayed with chemical agents and that the staff in the bubble responded that they would notify Taplin).

need[ed] [his] nebulizer treatment." Dkt. No. 7 at 3. There is no dispute that Taplin was present, helping put the person who'd been sprayed into bed restraints.

The most significant factual disputes relate to the plaintiff's condition during the next forty-five minutes or so and what the defendants observed. Taplin avers—and wrote in the roughly contemporaneous Nursing Narrative Note—that he saw the plaintiff yelling (and threatening staff) out of his cell door for some forty-five minutes, as well as kicking the door. Dkt. No. 62 at ¶¶11–12; Dkt. No. 63-1 at 21. He avers that he visually assessed the plaintiff and did not observe any signs or symptoms of an asthma attack, despite being familiar with such symptoms. Dkt. No. 62 at ¶¶13–20. He avers that during the forty-five minutes of yelling profanities and threats, the plaintiff did not give him any information that his inhaler wasn't effective. Id. at ¶23. Demers avers that after the other person was sprayed with OC spray, a member of the security staff contacted the health services unit "regarding [the plaintiff's] request for a nebulizer." Dkt. No. 61 at ¶12. He avers that during the entire incident, he could not "visibly tell that [the plaintiff] was having any problems breathing." Id. at ¶16. Demers, too, avers that Taplin visually assessed the plaintiff, and that Taplin discussed with the captain the plaintiff's behavior and the security risks involved in giving the plaintiff a nebulizer treatment. Id. at ¶¶16–17.

The plaintiff stated in his verified complaint that during the incident he told Taplin and Demers that he couldn't breathe, that he was wheezing severely and that he needed his nebulizer treatment. Dkt. No. 7 at 3. He averred in the

complaint that he was "struggling to breathe," and said that after the OC-sprayed person was put in the cell next to him, the plaintiff told Taplin that he was a severe asthmatic and was having trouble breathing due to the OC spray. Id. at 4. He averred that he told both Demers and another officer that he could not breathe, and that they told him he would not be getting the nebulizer due to his threats to staff. Id. The plaintiff also averred in the complaint that he explained to the officers in some detail his back-of-cell restriction and how they could use the trap box on his cell door to feed him the nebulizer tube through the door. Id. at 5. The plaintiff averred that he "collapsed on the floor" while housed in the restricted housing unit and that he woke up "what had seem 1½ to 2½ hours later." Id.

In his declaration in opposition to the motion for summary judgment, the plaintiff averred that because he did not get the nebulizer, he had an "asthma attack by falling out," referencing his own proposed findings of fact. Dkt. No. 88 at ¶16. He averred that he was "having problems breathing" due to the OC spray. Id. at ¶17. He averred that Taplin "never stopped at [his] door" on September 23, and that Demers stopped at his door only to tell the plaintiff that he would not be getting his nebulizer due to having made threats. Id. at ¶¶14–15. The plaintiff also averred that he told Taplin that his inhaler was not working (citing his own proposed findings of fact). Id. at ¶18.[6]

---

[6] In his opposition to the defendants' proposed findings of fact (which is not sworn and is not evidence), the plaintiff says that he was in distress when he was "allegedly using profanities and threats." Dkt. No. 91 at 4. He reiterates that Demers did not stop at his door and asserts that Taplin never "pulled

Viewing the facts in the light most favorable to the plaintiff, the plaintiff was having trouble breathing, was in distress and was wheezing. Nonetheless, the plaintiff was able to yell profanities, threaten staff and kick his door for some forty-five minutes. He was able to ask, more than once, for his nebulizer. He was able to tell the defendants what he was experiencing and explain to them his back-of-cell restriction and the method for using a trap box on the cell door so that staff could allow him to use the nebulizer without entering the cell. Neither Taplin nor Demers stopped at the plaintiff's cell and Taplin did not have the plaintiff removed from his cell, but both Demers and Taplin were able to view the plaintiff. Although the plaintiff was in distress, neither Demers nor Taplin observed signs of shortness of breath or wheezing. After the incident, the plaintiff "fell out" in his cell. For the plaintiff to receive a nebulizer treatment, someone would have had to fetch the nebulizer and at least two security staff would have had to be present while the trap box on the door was utilized to administer the treatment.

2. *Objective Component—Risk of Objectively Serious Harm*

"[N]ot every injury or deprivation suffered by a prisoner translates into constitutional liability for prison officials." *Henderson v. Sheahan*, 196 F.3d 839, 944 (7th Cir. 1999) (internal citations omitted). "Instead, only a jail official's 'deliberate indifference to a

---

[him] out to assess [his] asthma as [Taplin] should" and never stopped at his cell or looked in his cell door to determine whether he was wheezing and coughing. Id. He reiterates that he told Taplin that he was "in distress and couldnt breath." Id. He states that he was having trouble breathing and having tightness in his chest. Id. The plaintiff says that he was "in distress yelling—calling to staff to give [him] a nebulizer treatment due to [his] trouble breathing." Id. at 5. He reiterates that he told Taplin that his inhaler was not working. Id.

prisoner's serious illness or injury states a cause of action' under the Eighth Amendment." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)).

Peterson v. Bodlovich, 215 F.3d 1330, at *2 (7th Cir. 2000) (unpublished decision).

"Asthma, depending upon its degree, can be a serious medical condition." Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001). "But not all cases of asthma necessarily constitute serious medical needs." Lee v. Young, 533 F.3d 505, 510 (7th Cir. 2008).

In Oliver v. Deen, 77 F.3d 156, 158 (7th Cir. 1996), the plaintiff alleged that he suffered from asthma and that it was aggravated when he was placed in a cell with a smoker. He sued the defendants for violating his constitutional rights by putting him in cells with smokers. Id. The Seventh Circuit affirmed a grant of summary judgment in favor of the defendants, concluding that although the plaintiff was asthmatic and wheezed and showed other signs of discomfort when exposed to smoke, he'd never required outside hospitalization, had missed some medical appointments relating to his asthma and had what medical records characterized as "mild" asthma. Id. at 160. The court found that the plaintiff had not shown that he had a medical need sufficiently serious to implicate the Constitution.[7] Id. at 161.

_____

[7] The court held differently in the context of a motion to dismiss, finding that the district court had erred in concluding that the plaintiff failed to state an Eighth Amendment claim when he alleged that the defendants were deliberately indifferent to the fact that being exposed to smoke exacerbated his asthma. Alvarado v. Litscher, 267 F.3d 648 (7th Cir. 2001).

In Henderson, 196 F.3d at 842, the Seventh Circuit affirmed a grant of summary judgment where a plaintiff had alleged that his exposure to second-hand smoke in the Cook County jail had "caused him to experience difficulty in breathing, chest pains, dizziness, drowsiness, sinus problems, burning sensations in his throat and headaches."[8] Among other things, the Seventh Circuit concluded that "the injury of which [the plaintiff] complain[ed]—breathing problems, chest pains, dizziness, sinus problems, headaches and a loss of energy—[were], objectively speaking, relatively minor." Id. at 846.

In Bates v. Sullivan, 6 F. App'x 425 (7th Cir. 2001), the court affirmed the district court's grant of summary judgment against a plaintiff who alleged that on one occasion, the defendant allegedly refused to give him his inhaler. The court found that the plaintiff "alleged only that he was suffering breathing problems when he requested his inhaler and that he suffered shortness of breath and headaches from the incident;" it concluded that those symptoms were "not serious enough to implicate the Eighth Amendment." Id. at 428 (citing Henderson and Oliver).

In Board v. Farnham, the court concluded that a plaintiff who had increased his inhaler use while in the jail, had been taken to the emergency room, had started using a breathing machine for the first time in his life and had testified that several times the denial of an inhaler nearly killed him had alleged a sufficiently serious medical condition. Board, 394 F.3d 469, 484–85 (7th Cir. 2005). The court also concluded that the plaintiff had proven

---

[8] The plaintiff in Henderson did not assert that he suffered from asthma.

deliberate indifference, by showing that the defendants had engaged in a pattern of refusing to timely give the plaintiff his inhaler. Id. at 485.

In Williams v. Rodriguez, 509 F.3d 392, 397 (7th Cir. 2007), the plaintiff—who was in lockup after having been arrested—"hollered for hours that he needed his inhaler and knocked on the window and walls of his cell." After four or five hours, the plaintiff was told that he would be given his inhaler; when the plaintiff finally received the inhaler, he was allowed only a couple of puffs. Id. The plaintiff asked whether he could call his wife so she could bring his other asthma medication, telling the lockup keeper "that if he did not receive the proper medication for his asthma he could die." Id. The lockup keeper ignored the plaintiff. Id. The plaintiff went to the hospital for his asthma a day or so after being released from custody. Id. The plaintiff sued for, among other things, deliberate indifference. Id. at 398.

While acknowledging that asthma can be, and often is, a serious medical condition (citing Board, 394 F.3d at 484), the Seventh Circuit observed that the issue was whether the plaintiff "was suffering from a sufficiently severe asthma attack the night he was arrested." Id. at 401. The court concluded that it was not, explaining:

> [The plaintiff's] first mention of his asthmatic condition occurred when Officer Rodriguez asked him to take a breathalyzer test. It was at this point that [the plaintiff] told Officer Rodriguez that he had asthma, "needed [his] medication," and "can't breathe." These statements, when arising in the context of a request for [the plaintiff] to take a breathalyzer test, are insufficient by themselves to show that [the plaintiff] was suffering from a serious asthma attack. At no other point during processing did [the plaintiff] affirmatively request his inhaler or any medical attention from Officer Rodriguez or any of the other officers present. [The plaintiff] responds to this, stating

that his silence during processing was due to his focus on trying to control his breathing. While [the plaintiff's] explanation for his silence is evidence that he was suffering from asthmatic symptoms, this also indicates that during processing, [the plaintiff's] asthma was not so severe that he was unable to control his breathing without immediate medical assistance. In addition, aside from [the plaintiff's] attempt to control his breathing, there is no evidence in the record showing that [the plaintiff] was exhibiting physical symptoms reflective of an asthma attack while in processing. Furthermore, although [the plaintiff's] wife and brother put Officer Rodriguez on additional notice of [the plaintiff's] asthma when they gave Officer Rodriguez [the plaintiff's] inhaler, there is no evidence that they told Officer Rodriguez that [the plaintiff] was in immediate need of his inhaler due to a current asthma attack. Thus, the facts, when viewed in the light most favorable to [the plaintiff], fail to show that his asthma was sufficiently severe during processing to be considered objectively serious for purposes of his deliberate indifferent claim against Officer Rodriguez.

Id. at 402. The court affirmed the district court's grant of summary judgment in favor of the defendant.

In Daniels v. Harper, 640 F. App'x 519 (7th Cir. 2016), the Seventh Circuit affirmed the district court's grant of summary judgment because, even assuming that the plaintiff had a severe asthma attack, he had told the defendant nurse only that he was having difficulty breathing and wanted treatment. Id. at 521. He did not demonstrate that the defendant nurse observed "wheezing, coughing, shallow breathing, nausea, light-headedness, and an inability to complete sentences;" the court concluded that because the nurse did not see and disregard "symptoms of a severe [asthma] attack," she was not aware of a substantial risk of serious harm that required immediate medical attention. Id.

No one disputes that the plaintiff has asthma. The question is whether the plaintiff has demonstrated that on September 23, 2020, he was suffering

from a severe asthma attack sufficient to constitute a serious medical condition. No reasonable jury could conclude that the plaintiff has proven that fact. The plaintiff has alleged that he was having an asthma attack; viewing the facts in the light most favorable to him, the court accepts that he was. He has alleged that he was having trouble breathing and that he was wheezing; again, viewing the facts in the light most favorable to the plaintiff, the court accepts that he was. But the evidence shows that the plaintiff was able to yell profanities and threats for some forty-five minutes. He was able to describe to the defendants his back-of-cell restriction and the process for giving him nebulizer treatments from outside of his cell. He was able to repeatedly ask for nebulizer treatment. Even viewing the facts in the light most favorable to the plaintiff, a reasonable jury could not conclude that the plaintiff was in severe distress or immediate danger.

The plaintiff says that at some point, he "fell out" in his cell due to not getting the nebulizer treatment. The court interprets this as an allegation that the plaintiff lost consciousness. But the plaintiff does not allege that he was injured; he has not alleged or proven that he hit his head or otherwise injured himself when he "fell out," only that he did so. The plaintiff presented no medical evidence in support of his assertion that the reason he "fell out" was because he did not get the nebulizer treatment.

The plaintiff has not proven the objective component of deliberate indifference.

3.    *Subjective Component—Reckless Disregard of Risk*

Nor has the plaintiff demonstrated the subjective component—that Taplin and Demers were aware of a risk to the plaintiff but recklessly disregarded it. In <u>Peterson</u>, the Seventh Circuit affirmed the district court's grant of summary judgment in favor of the defendants on the plaintiff's claim that the defendants' refusal to move him to a dormitory where cats were not allowed despite his argument that exposure to cats exacerbated his asthma constituted deliberate indifference. <u>Peterson</u>, 215 F.3d 1330 at *1–2. The court questioned whether the plaintiff's discomfort around cats was sufficiently serious but noted that his doctor had found his asthma and allergies serious enough to recommend that he be moved to a part of the prison without cats. <u>Id.</u> at *2. Regardless, the court concluded that the defendants had not shown deliberate indifference to the plaintiff's asthma because they had changed his assignment and offered him a cell near a door, as well as because they had treated him medically. <u>Id.</u>

In <u>Garvin</u>, the Seventh Circuit assumed for the purposes of appeal that the plaintiff's asthma was sufficiently serious but affirmed the grant of summary judgment when it concluded that the defendant doctor had taken steps to address the plaintiff's complaints about the delay in providing him with his inhaler. <u>Garvin</u>, 236 F.3d at 898–99. And in <u>Lee</u>, the Seventh Circuit concluded that the non-medical defendants did not ignore or contradict medical advice in responding to the plaintiff's allegations that smoke exacerbated his asthma and that the record was "replete" with the defendants

responding to the plaintiff's concerns. Lee, 533 F.3d at 510-511. See also, Kadamovas v. Caraway, 775 F. App'x 242 (7th Cir. 2019) (plaintiff did not present evidence that the defendants were deliberately indifferent to his claims that tear gas and secondhand smoke exacerbated his asthma).

a.  Taplin

Taplin knew the plaintiff had received nebulizer treatment in the past for his asthma. He avers that he visually assessed the plaintiff and did not see any of the signs or symptoms he associated with a severe asthma attack; rather, he heard the plaintiff yelling profanities and threats and asking for his nebulizer for some forty-five minutes. The plaintiff argues that Taplin did not "stop" at his cell or "pull him out" of the cell to assess him, but Taplin has not averred that he did either of those things. Taplin says only that he "visually assessed" the plaintiff. The plaintiff has not presented evidence that Taplin could not see or hear him. To the contrary, the evidence demonstrates that Taplin *could* hear the plaintiff yelling for an extended period—evidence to a trained nurse that the plaintiff was not in severe distress.

Taplin acknowledges that although the plaintiff was asking for nebulizer treatment, Taplin decided not to provide that treatment at that time. The evidence shows that a risky situation had unfolded. Another person had been sprayed with OC spray and was being moved from one cell to another and placed in bed restraints. In the middle of this process, the plaintiff asked for nebulizer treatment. The plaintiff's own evidence shows that to remove the plaintiff from his cell, a three-officer escort would have had to be approved by

the restricted housing unit director. To give the plaintiff the nebulizer treatment, someone would have had to fetch the nebulizer and the extension cord, set it up with the trap box and administer it to the plaintiff, despite his yelling and threats and despite the still-extant situation with the person who'd been sprayed. At least two members of the security staff would have had to be present. The plaintiff had an inhaler in his cell. Analyzing the totality of the circumstances, Taplin decided that he was not going to give the plaintiff the nebulizer treatment. This was not deliberate indifference; it was a reasoned analysis of the security situation and the lack of visible or audible evidence that the plaintiff was having a severe asthma attack.

As for the inhaler—Taplin avers that the plaintiff "gave [him] no information" that the Albuterol inhaler was ineffective, while the plaintiff stated in his declaration in opposition to summary judgment that he told Taplin the inhaler wasn't working. This is a factual dispute. But given the totality of the circumstances, it is not a material one. Given the plaintiff's continued yelling and the fact that Taplin did not observe any evidence that the plaintiff was having a severe asthma attack, coupled with the security risks, no reasonable jury could find that Taplin was deliberately indifferent even if the plaintiff told Taplin that the inhaler was not working. Taplin assessed the plaintiff's behavior and made a professional decision that the plaintiff did not require immediate nebulizer treatment. That is not deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 805 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because

professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

The plaintiff says that although he was told that he wasn't getting the nebulizer treatment because of his threats to staff, he has received medical treatment in the past despite threatening officers. He filed declarations from two other incarcerated persons who averred that they had received medical treatment at Waupun after threatening prison staff. But neither the plaintiff nor the other incarcerated persons describe the circumstances under which they received that treatment in the past. Here, the defendants were dealing with a security incident involving another incarcerated person whose behavior had required that he be sprayed with OC spray. The person asking for nebulizer treatment—the plaintiff—was subject to a restriction that at least two security personnel be present during administration of the nebulizer treatment at his cell and that the nebulizer treatment must be given via a trap box on the door. The issue is not whether persons who threaten staff get medical treatment; it is whether, under the particular circumstances that existed at the time the plaintiff asked for his nebulizer on September 23, 2020, Taplin was deliberately indifferent in balancing his observation of the plaintiff's condition with the security risk. No reasonable jury could conclude that he was.

Considering all the evidence in the record, a reasonable jury could not conclude that Taplin was deliberately indifferent on September 23, 2020 in refusing to give the plaintiff his nebulizer treatment. Taplin is entitled to judgment as a matter of law.

b.    Demers

Demers avers that on September 23, 2020, he did not know the plaintiff was asthmatic. Dkt. No. 61 at ¶10. The plaintiff avers Demers *did* know he is asthmatic because Demers "saw [the plaintiff] use a nebulizer before for [his] asthma." Dkt. No. 88 at ¶10. Although there is a dispute about whether Demers knew the plaintiff was an asthmatic on September 23, 2020, that dispute is immaterial. Demers is a non-medical prison official and he defers to the judgment of medical staff in medical decisions. It is undisputed that Demers does not have the authority to unilaterally provide or refuse medical treatment to an inmate. He instead consults with medical staff to determine what treatment is appropriate. As a non-medical official, Demers was "'entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care.'" Eagan v. Dempsey, 987 F.3d 667, 694 (7th Cir. 2021) (quoting Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008)). It is only when a nonmedical official "simply ignore[s] an inmate's plight" or has sufficient notice of "an excessive risk to inmate health or safety" that he may be found deliberately indifferent. Arnett v. Webster, 658 F.3d 742, 755 (7th Cir. 2011) (citing Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005); Vance v. Peters, 97 F.3d 987, 993 (7th Cir. 1996)); see Berry v. Peterman, 604 F.3d 435, 440 (7th Cir. 2010) (reiterating that nonmedical officer was "entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate]").

31

There is no evidence that Demers ignored the plaintiff or had notice of an excessive risk to his health. Demers averred that a member of the security staff contacted the HSU about the plaintiff's request for a nebulizer. He avers that looking at the plaintiff, he saw no signs that the plaintiff was in distress. Otherwise, Demers deferred to Taplin's medical judgment regarding the plaintiff's need for nebulizer treatment. There is no evidence that Taplin was deliberately indifferent to the plaintiff's serious medical need. Demers was entitled to rely on Taplin's determination that the plaintiff did not require immediate nebulizer treatment. Demers, as a non-medical official, was not required to second-guess Taplin's assessment or determine for himself whether he believed the plaintiff required nebulizer treatment. See Arnett, 658 F.3d at 742; Berry, 604 F.3d at 440.

4.   *Actual Injury*

Finally, the court notes that the plaintiff has not alleged an actual injury resulting from this incident. In the complaint's request for relief, the plaintiff says that he wants punitive damages for "the chemical agents getting in [his] lungs making it hard for [him] to sleep at night . . . ." Dkt. No. 7 at 6. But there are no allegations that either Taplin or Demers were responsible for any chemical spray getting in the plaintiff's lungs. The plaintiff also asked for damages "due to . . . passing out." Id. As the court has noted, the plaintiff has not described any injury he suffered from passing out, other than the fact that he did so. To recover for a civil rights violation under 42 U.S.C. §1983, a plaintiff must demonstrate "that he experienced . . . cognizable harm." Lord v.

Beahm, 952 F.3d 902, 905 (7th Cir. 2020). The plaintiff has asked for money damages, but has not provided any evidence of injury.

### III. Conclusion

Because the plaintiff has not demonstrated that he was suffering from a severe asthma attack on September 23, 2020, has not demonstrated that Taplin or Demers were deliberately indifferent to his serious medical need and has not demonstrated that he suffered a compensable injury, the court will grant summary judgment in favor of the defendants and will dismiss the case.[9]

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 58.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

---

[9] Because the court is granting summary judgment to the defendants on the merits, it need not analyze their claim that they are entitled to qualified immunity. See Sierra-Lopez v. County, No. 17-CV-1222-PP, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (citing Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, No. 17-CV-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 19th day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**